SALLIE C. MORTON, The (WOOD v.). See Case No. 17,962.

---

## Case No. 12,257.

### The SALLY.

### [1 Gall. 58.] [1]

Circuit Court, D. Massachusetts. May Term, 1812.

#### EMBARGO—FOREIGN VESSEL.

Under the 5th section of embargo act of Jan. 9, 1808, c. 8 [2 Stat. 454], a foreign vessel means a vessel navigating under the flag of a foreign power, and not a vessel owned in whole or part by foreigners domiciled in the United States.

[Appeal from the district court of the United States for the district of Massachusetts.]

In admiralty.

G. Blake, for the United States.
Thurston & Dexter, for claimant.

STORY, Circuit Justice. The libel in this case contains three counts. I shall confine myself to the first, because, on the hearing, the others were abandoned by the counsel for the United States. That count alleges, that during the continuance of the embargo, to wit, in the month of September, 1808, the said vessel, being a foreign bottom, within the district of Boston and Charlestown, did take on board certain goods, wares and merchandize, mentioned in the schedule annexed to the libel, contrary to the act laying an embargo, and the act supplementary thereto: whereby the said vessel, and the goods, wares and merchandize found on board the same vessel, have become wholly forfeited.

The facts appear to be these. Previous to the seizure, (which was in September, 1808,) the vessel belonged to Messrs. Newhall and Niles, American citizens. by whom she had been employed in the fisheries, under a license and enrolment, which some months before had expired, and had been cancelled. The vessel was afterwards sold (whether really or colorably I pretend not to say) to Mackenzie. the claimant, who is proved to have been at the time of the sale, (which was about six weeks or two months before the seizure,) a British subject, resident in Boston. On the morning of the seizure. the vessel was found near Harris's wharf in Boston, on the flats, nearly laden with flour and other articles mentioned in the libel. Every appearance indicated, that she had been recently laden, and it is proved, that she must have been laden after the sale to Mackenzie. It is admitted. that the vessel had not proceeded out of the port after being laden.

---

[1] [Reported by John Gallison, Esq.]

The single question presented to the court by the counsel is, whether this vessel was a foreign vessel within the true intent and meaning of the 5th section of the act of 9th Jan., 1808, c. 8. That section is in these words: "That if any foreign ship or vessel, shall, during the continuance of the act to which this act is a supplement, take on board any specie, or any goods, wares or merchandize, other than the provisions, and sea stores necessary for the voyage, such ship or vessel, and the specie and cargo on board shall be wholly forfeited, and may be seized and condemned in any court of the United States, having competent jurisdiction, and every person concerned in such unlawful shipment shall forfeit and pay a sum not exceeding twenty thousand dollars, nor less than one thousand dollars, for every such offence." 9 Laws [Weightman's Ed.] 13 [2 Stat. 454].

The attorney for the United States contends, that the true meaning of "foreign ship or vessel," used in the act, is a vessel owned in whole or in part by foreigners domiciled in the United States, and he cites the registry act (2 Laws [Folwell's Ed.] 148, § 16 [1 Stat. 295]), to show the effect of transferring a registered vessel to a foreigner, and also the supplementary act 27th June, 1797, c. 5 (4 Laws [Folwell's Ed.] 11 [1 Stat. 523]), which declares that all registered vessels, which shall be captured and condemned and pass into the ownership of third persons, shall be deemed foreign vessels. This argument applies to registered vessels only, and does not appear to me to carry much weight with it. Undoubtedly the appellation of "foreign vessels" may sometimes be applied to all vessels not registered or licensed, in reference to the privileges derived from the revenue system; but it is as certain, that in a variety of instances our laws also contemplate the use of the words in their appropriate sense, to wit, vessels navigating under the flag and with the papers of a foreign sovereign. It may be remarked also, that there is no provision in our laws, declaring, that a licensed vessel. transferred to an alien, shall be deemed a foreign vessel; but in such case the vessel is undoubtedly forfeited under the coasting act. Act Feb. 18. 1793. c. 8, § 32 (2 Laws [Folwell's Ed.] 193 [1 Stat. 316]).

Let us now endeavor to seek the true construction of the section in question, by comparing it with other provisions in the embargo acts, for these acts being all in pari materia, must be construed together, as one statute. The act laying an embargo on all ships and vessels within the limits of the United States, bound to a foreign port, expressly allows the departure of any foreign ship or vessel, either in ballast or with the cargo then on board. There can be no doubt. that this act meant by foreign ships such as were owned by foreigners. and navigating under the protection and papers of a foreign government. Any other construction would defeat the obvious intent of the legislature.

The same act exempted from the operation of the embargo all armed vessels, possessing public commissions from any foreign power. The 4th section of the act of 9th Jan. 1808, c. 8, provides, that this exemption shall apply only to public armed vessels, and not to privateers or letters of marque, or any private armed vessels, but that such private armed vessels shall be permitted to depart in the same manner, as is provided for other private foreign ships or vessels. Here again it is manifest, that the legislature speak, not of vessels owned by citizens and domiciled foreigners, having no foreign papers, but of ships armed or sailing under the authority of a foreign sovereign. Then follows the section in controversy, which seems to be directly governed in its language by the preceding. Soon afterwards the legislature, by the act 12th March, 1808, c. 323 [2 Stat. 473], provided, that no foreign vessel should depart from any port of the United States, with a cargo destined for another part of the United States, without giving bonds to reland the cargo in the United States; and the same security was required of vessels owned by citizens of the United States not registered, licensed, or possessing a sea letter. In this act, the words "American" and "foreign" are used in opposition to each other, and import, as I apprehend, vessels navigating under the flag of different powers. Still the coasting trade from port to port of the United States was lawful to aliens. But by the 9th section of the act of 25th April, 1808, c. 66 [2 Stat. 501], it was expressly prohibited.

In all these various provisions I can perceive only a progressive system of rigor towards the same class of vessels. The obvious intent of the legislature was, to prohibit all American citizens and American property from a commerce with foreign countries. Yet at no time was it illegal for a foreign vessel to depart from the United States to a foreign country in ballast; and if the construction contended for by the attorney for the United States be correct, a mere colorable transfer of any undivided portion of an American ship to a foreigner would have enabled such ship to depart for a foreign port, and thereby in effect the whole operation of the embargo acts would have been defeated. I am therefore satisfied, that the true construction of the 5th section requires, "ut res magis valeat, quam pereat," that the foreign vessels named therein should be deemed such, as have the acknowledged character and papers of vessels navigated under the protection and laws of a foreign realm. I must therefore affirm the decree. I cannot however but remark, that the libel is very defective in not alleging, that the goods taken on board were not sea stores or provisions necessary for the voyage, for it was certainly lawful to load such goods, and they constitute an express exception in the statute.

Let the decree be affirmed, and certify reasonable cause of seizure.